**Slip Op. 08-71**

# UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Nicholas Tsoucalas, Senior Judge

| | |
|---|---|
| LAIZHOU AUTO BRAKE EQUIPMENT COMPANY; LONGKOU HAIMENG MACHINERY CO., LTD.; LAIZHOU LUQI MACHINERY CO., LTD.; LAIZHOU HONGDA AUTO REPLACEMENT PARTS CO., LTD.; HONGFA MACHINERY (DALIAN) CO.; and QINGDAO GREN (GROUP) CO. | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : |
| and | : Court No.: 06-00430 <br> : |
| LONGKOU TLC MACHINERY CO., LTD. | : <br> : |
| Plaintiff-Intervenor, | : |
| v. | : <br> : |
| UNITED STATES OF AMERICA, | : <br> : |
| Defendant, | : <br> : |
| and | : <br> : |
| COALITION FOR THE PRESERVATION OF AMERICAN BRAKE DRUM AND ROTOR AFTERMARKET MANUFACTURERS | : <br> : <br> : <br> : |
| Defendant-Intervenor. | : |

June 26, 2008

**Held:** The United States Department of Commerce's Final Determination sustained in part, remanded in part.

Trade Pacific PLLC, (Robert G. Gosselink) for Laizhou Auto Brake Equipment Company; Longkou Haimeng Machinery Co., Ltd.; Laizhou Luqi Machinery Co., Ltd.; Laizhou Hongda Auto Replacement Parts Co., Ltd.; Hongfa Machinery (Dalian) Co.; and Qingdao Gren (Group) Co.; Plaintiffs.

Gregory G. Katsas, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Jeanne Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Courtney Sheehan); Of Counsel: Melanie A. Frank, Office of Chief Counsel, Department of Commerce, for the United States, Defendant.

Porter, Wright, Morris & Arthur, LLP, (Leslie Alan Glick) for The Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers, Defendant-Intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** This matter is before the Court on a motion for judgment upon the agency record brought by the Plaintiffs pursuant to USCIT Rule 56.2.[1]

Plaintiffs challenge numerous aspects of the U.S. Department of Commerce's final determination with respect to the eighth antidumping administrative review of the antidumping order in Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of the 2004/2005 Administrative Review and Notice of Rescission of 2004/2005 New Shipper Review ("Final Determination"), 71 Fed. Reg. 66304 (Nov. 14, 2006). Plaintiffs contend certain aspects of Commerce's determination is contrary to law, constitutes an abuse of discretion and is not supported by substantial evidence on the record. See Revised Mem. of P. & A. in

---

[1] Plaintiff-Intervenor Longkou TLC Machinery Co., Ltd. filed a notice of dismissal on July 18, 2007 and is not a party to this case.

Supp. of Pls.' Mot. for J. upon the Agency R. ("Pls.' Br.").[2]  For the reasons set forth below, the Court sustains the Final Determination in part, and remands it in part.

## BACKGROUND

Laizhou Auto Brake Equipment Company ("LABEC"); Longkou Haimeng Machinery Co., Ltd. ("Haimeng"); Laizhou Luqi Machinery Co., Ltd. ("Luqi"); Laizhou Hongda Auto Replacement Parts Co., Ltd. ("Hongda"); Hongfa Machinery (Dalian) Co. ("Hongfa"); and Qingdao Gren (Group) Co. ("Gren") (collectively "Plaintiffs") contest aspects of the U.S. Department of Commerce's Final Determination. Plaintiffs are producers and exporters of the subject merchandise covered by the antidumping duty order on brake rotors from the People's Republic of China.

On April 1, 2005, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order of brake rotors from China for the period April 1, 2004 through March 31, 2005 ("the period of review" or "POR").  See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 70 Fed. Reg. 16799. On May 27, 2005, Commerce initiated the eighth administrative review of brake rotors from China for twenty-seven individually

---

[2] Unless otherwise noted, reference to all documents herein shall refer to the public version of those documents.

named firms.    See Notice of Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part ("Initiation Notice"), 70 Fed. Reg. 30694.

On June 7, 2005, Commerce issued a letter to all firms named in the Initiation Notice indicating that "[d]ue to the large number of requests for administrative review and the Department's experience regarding the resulting administrative burden to review each company for which a request has been made, the Department is considering to exercise its authority to select respondents by sampling," and requiring that each company subject to this administrative review submit certain business information.  Letter to All Interested Parties, Public Record ("PR") Doc. No. 5. Plaintiffs' responded to Commerce's request on June 24, 2005.[3] See Letters from Law Firm of Trade Pacific, Confidential Record ("CR") Doc. Nos. 5, 7, 8, 10 and 12; Pls.' Br. at 4.  On October 14, 2005, Commerce instructed interested parties that it had decided to use a probability-proportional-to-size ("PPS") sampling methodology to limit the number of respondents in the review ("Sample Proposal Letter").[4]  See Sample Proposal Letter, PR Doc. No. 91.  Commerce indicated in the Sample Proposal Letter that it intended to include

---

[3]  Commerce sent another letter on September 15, 2005 requesting additional information to which Plaintiffs responded on September 19, 2005.  Pls.' Br. at 5.

[4]  Commerce stated that it intended to individually review four respondents. See Sample Proposal Letter.

in the calculation of the sample rate any respondent margins based on facts available, including adverse fact available, zero and <u>de minimis</u> rates.

After receiving comments on its proposed sampling method from several of the Plaintiffs, Commerce announced in a letter dated November 10, 2005 ("Sample Decision Letter"), that it decided to apply the PPS methodology previously described in its Sample Proposal Letter.[5]  <u>See</u> Sample Decision Letter, PR Doc. No. 98. Commerce noted that it would individually review five companies, adding that "if a respondent selected for review fails to participate in the review, the Department will not choose another respondent in its place."  On November 16, 2005, Commerce conducted its sampling and chose the five companies to be individually examined.[6]  <u>See</u> Released Letter to Interested Parties, PR Doc. No. 100.

Ultimately, the administrative review covered sixteen

---

[5]  Plaintiffs LABEC, Haimeng, Hongda, Hongfa and Luqi submitted comments on October 24, 2005, among other things, contesting the inclusion in the sample rate of any respondent margins that were based on facts available. <u>See</u> Repondents Comments re Sampling Methodology Letter, PR Doc. No. 96.; Pls.' Br. at 7.

[6]  Among the five companies chosen were Plaintiffs Hongfa and Haimeng.  Plaintiffs LABEC, Luqi, Hongda and Gren were not among the sampled group. The three companies chosen for the sampled group who are not a party to this case are Qingdao Meita Automotive Industry Co., Ltd.; Yantai Winhere Auto-Part Manufacturing Co., Ltd.; and Xiangfen Hengtai Brake Systems Co., Ltd. <u>See</u> Preliminary Results at 26737; Complaint at 3.

participating firms, including all of the Plaintiffs.  See Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the 2004/2005 Administrative Review and Preliminary Notice of Intent to Rescind of 2004/2005 New Shipper Review ("Preliminary Results"), 71 Fed. Reg. 26736 (May 8, 2006).[7] In the Preliminary Results, Commerce assigned an adverse facts available rate of 43.32% to mandatory respondent Hengtai Brake Systems Co., Ltd. ("Hengtai"), based on Hengtai's failure to provide Commerce with accurate and complete data.  Commerce included that 43.32% adverse facts rate in the calculation of the sample antidumping duty rate (the "sample rate") for the non-sampled respondents (including Plaintiffs LABEC, Hongda, Luqi and Gren).  In its Final Determination Commerce confirmed the adverse facts available rate was warranted as to Hengtai and again included that 43.32% adverse facts rate in the calculation of the group sample rate assigned to the non-sampled respondents. See 71 Fed. Reg. 66304.

Plaintiffs seek judgment on the agency record under USCIT Rule 56.2 with respect to six issues.  Three issues involve Commerce's valuation of certain factors of production (i.e., pig iron, steel

---

[7] Of the twenty-seven firms named in the Initiation Notice, only eighteen had shipments of subject merchandise into the U.S. during the POR, and two of those were participating in an on-going new shipper review.  The resulting administrative review, therefore, covered sixteen firms, including all the Plaintiffs. See Preliminary Results, 71 Fed. Reg. at 26737.

scrap, and labor wage rate), and three issues involve certain decisions Commerce undertook with regard to the calculation and application of a sample antidumping rate.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

In reviewing Commerce's antidumping duty determination, the Court will uphold such determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).

**DISCUSSION**

## I.  Analysis of Surrogate Value Issues

In an antidumping investigation, Commerce must determine
whether the subject merchandise is being, or is likely to be, sold
at less than fair value in the United States by comparing the
export price with the normal value of the merchandise. See 19
U.S.C. § 1677b(a). In cases involving exports from a nonmarket
economy ("NME"), Commerce must determine normal value "on the basis
of the value of the factors of production utilized in producing the
merchandise."[8] 19 U.S.C. § 1677b(c)(1).

According to the statute, Commerce must value factors of
production "based on the best available information regarding the
values of such factors in a market economy country or countries
considered to be appropriate."  19 U.S.C. § 1677b(c)(1).  The
statute does not define "best available information."

In this review Commerce calculated normal value by multiplying

_____

[8] The relevant portion of 19 U.S.C. § 1677b(c) is set forth
below:
(c) Nonmarket economy countries
(1) In general
If- (A) the subject merchandise is exported from a nonmarket
economy country, and
(B) the administering authority finds that available information
does not permit the normal value of the subject merchandise to be
determined under subsection (a) of this section,
the administering authority shall determine the normal value of
the subject merchandise on the basis of the value of the factors
of production utilized in producing the merchandise.

the reported per unit factor quantities by publicly available Indian surrogate values. See Def.'s Resp. in Opp'n to Pls.' Mot. for J. upon the Agency R. ("Commerce Br.") at 28. Commerce notes that it considered the "quality, specificity, and contemporaneity of the data." Id.

Plaintiffs contest Commerce's Final Determination with respect to three factors of production: (i) pig iron, (ii) steel scrap, and (iii) labor wage rate.

## A.  Selection of Import Data to Value Pig Iron

In order to value pig iron, Commerce used publicly available import statistics obtained from the World Trade Atlas ("WTA") relating to India.  Commerce selected Harmonized Tariff System ("HTS") subheading 7201.10.00 for this product, which covers non-alloy pig iron containing less than 0.5% phosphorus. See Issues and Decision Memorandum for the Final Results in the 2004/2005 Administrative Review and New Shipper Review of Brake Rotors from the People's Republic of China (the "Issues and Decision Memorandum") at 23.

Plaintiffs argue that Commerce's valuation is unsupported by substantial evidence and contrary to law. Specifically, Plaintiffs contend that Commerce should have used the publicly-available information that Plaintiffs submitted from four Indian steel producers for valuation, which in total purchased and consumed

681,675.70 metric tons of pig iron during the POR. See Pls.' Br. at 24. Plaintiffs note that during the POR India imported approximately 6,860 metric tons of pig iron under this HTS subheading.[9]  Id. at 24.

Additionally, Plaintiffs point to prior decisions of the Court to argue that (i) in order for Commerce to use import data "there must be reason to believe that the industry in question would use imported inputs," Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1278 (2006), and (ii) Commerce may use import statistics as the basis for a surrogate value only "after concluding that they {the import statistics} are based on commercially and statistically significant quantities," Polyethylene Retail Carrier Bag Committee v. United States, 29 CIT 1418, 1444 (2005) (alteration in original) (citing Shanghai Foreign Trade Enter. Co. v. United States, 318 F. Supp. 2d 1339, 1352-53 (2004)).  See Pls.' Br. at 26.

In defense of its position, Commerce explains that it used the WTA data because it was "contemporaneous with the period of review and . . . specific to the inputs used in the production of subject merchandise." Commerce Br. at 30-31.  Commerce further explains that it did not use the alternative surrogate value data proposed by Plaintiffs because "it was not specific to the types of

---

[9]    Plaintiffs point out that the amount encompassed in their alternative data is about 100 times the quantity imported into India during the same period. See Pls.' Br. at 24.

materials used by the Chinese producers in the review."[10]  Id. at
31.  Commerce adds that the raw material values reported for one of
the Indian companies related to "inter plant transfers," which
raises questions as to whether these sales were arms-length
transactions.  Id. at 32.  Lastly, Commerce notes that the WTA data
"represent a broader, overall more representative data source"
because it was collected from imports into all of India, as opposed
to collected from a few select companies.  Id.

In examining the record and considering the arguments the
Court finds that Commerce's determination, that the WTA data
constituted the best available information for valuing pig iron,
was reasonable and based on substantial evidence on the record.  In
the process, Commerce determined that a relatively smaller amount
of data that was representative (in both contemporaneity and
specificity to the raw material at issue) was preferable in this
case to a larger amount of data whose representativeness was
dubious.  Plaintiffs' arguments supporting their alternative data
as a better valuator of pig iron fall in one of two categories: (i)
the amount of steel imported into India is objectively low and
therefore likely to be commercially insignificant; and (ii) the
Indian companies data is of a much larger sample size and therefore

---

[10]  Commerce noted that two of the Indian companies did not
specify the types of pig iron consumed in the production of their
merchandise.  Commerce Br. at 32.

is better.  As Commerce has demonstrated, both contentions are flawed.

Commerce answers Plaintiffs' argument that the volume of import trade is too small to be significant by noting correctly that "a smaller volume of trade may still be commercially or statistically significant if it includes values that are representative of the product in question." Commerce Br. at 33. Here, Commerce has sufficiently detailed the representativeness of the WTA data set.  Additionally, in its Issues and Decision Memorandum,  Commerce notes that the volume of non-alloy pig iron imported into India "significantly exceeds the volume of pig iron consumed by several of the respondents."  See Issues and Decision Memorandum at 25.

As to the alternative data set pertaining to the Indian companies, Commerce adequately detailed the numerous reasons why that data was not preferable.  Commerce explained, for instance, that a few of the Indian companies did not specify the types of pig iron consumed in the production process and therefore Commerce could not be confident that the data from the Indian companies is specific to the type of pig iron consumed in the production of the subject merchandise here.[11]  Commerce Br. at 32.

_____

[11]  Plaintiffs contention that "it is not clear . . . that the 'pig iron' being imported into India under HTS 7201.10.00 is similar to the pig iron consumed by the mandatory respondents,"

(continued...)

Lastly, Plaintiffs' reliance on Dorbest for the proposition that in order for Commerce to use import data "there must be reason to believe that the industry in question would use imported inputs" is misplaced, as the quoted language is taken out of context. Dorbest, 462 F. Supp. 2d at 1278. Commerce need only show why domestic data is not reliable, or less reliable than the import data, which it has done here.[12]

It is clear that a larger data set, in and of itself, is not necessarily better in valuing factors of production than a smaller one. As is the case here, representativeness and reliability are two important factors that distinguish one data set from another. The representativeness and reliability of the WTA data set is discussed above, and the record here shows that as a data set it was contemporaneous with the period of review, specific to the inputs used in the production process, and was broadly collected

---

[11](...continued)
is not convincing. Reply Mem. in Supp. of Mot. for J. upon the Agency R. ("Pls.' Reply Br.") (confidential version) at 20. The facts Plaintiffs cite, without anything more, do not weaken Commerce's determination as to the representativeness of the data. See id. at 20-21.

[12] Dorbest states that "[i]f it is unlikely that the domestic industry would use imported inputs, and there is domestic data available, then Commerce's choice of import data to value factor inputs may not be reasonable." 462 F. Supp. 2d at 1279. Contrary to Plaintiffs' contention, there is no prerequisite that Commerce establish in all cases that the industry in question would use imported inputs. Commerce has established here that the domestic data, although available, is less reliable than the WTA import data, and therefore it is not the best available information.

from imports into all of India as opposed to from a few companies. Plaintiffs' proposed data set, in contrast, was collected from a handful of companies and was found lacking in specificity to the inputs used in the production process.

The Court must therefore conclude that the WTA import data is, whatever its failings, the best available information for calculating this factor of production.  For all the reasons above, the Court is satisfied that Commerce's determination here is reasonable and based on substantial evidence on the record.

### B.  Valuation of Steel Scrap

Commerce valued the industrial metal scrap that Plaintiffs purchased and consumed in the production of brake rotors using HTS classification 7204.10.00, which covers "cast iron scrap."[13]  <u>See</u> Issues and Decision Memorandum at 28. Commerce explains that it used the cast iron scrap category because the foreign producers indicated in their submissions that they consumed "steel scrap, including scrapped and rejected rotors, as well as casting strands/handles (extrusions from the actual rotor that are removed) and filings from the lathing process."  Commerce Br. at 33 <u>citing</u> Plaintiffs Haimeng and Hongfa's Questionnaire Responses, CR Doc.

_____

[13]  Commerce notes that this was an option suggested by certain of the Plaintiffs as an alternative to the "other ferrous scrap" classification they sought during the administrative proceedings. Commerce Br. at 33.

Nos. 63, 64. Commerce further explains that because "the scrap was comprised of casting strands and handles, as well as scrapped and rejected rotors (which in this case are made from gray cast iron)," it selected the HTS classification corresponding to cast iron scrap. Commerce Br. at 33. Commerce concludes that "because these are cast iron brake rotors the most relevant steel scrap to value for this factor of production would be cast iron steel scrap." Id. at 34.

Lastly, Commerce argues that "the basket category proposed by plaintiffs would not include cast iron scrap - the predominant scrap used in the production of these cast iron rotors." Id. at 35.

Plaintiffs argue that Commerce should have used HTS classification 7204.49.00, which covers "other ferrous scrap" to value the steel scrap purchased by Plaintiffs. Pls.' Br. at 32. Plaintiffs argue that the "other ferrous scrap" category is more specific to the factor of production being valued and "is of better quality because it covers a larger volume of imports." Id.

The crux of Plaintiffs' argument is that Commerce is incorrectly "focusing on the production process rather than on the specific factor to be valued." Pls.' Reply Br. at 13. Plaintiffs admit that the brake rotor production process includes the reintroduction of scrapped and rejected rotors but contend that "the issue is not what types of scrap generally are used in the production process [but] [r]ather . . . what type of scrap did the

respondents report in the factor field 'STLSCRAP,' which Commerce needs to value in the calculation of normal value." Id. Plaintiffs state that there is no such thing as "cast iron steel scrap" and argue that this "misunderstanding exposes the irrationality of Commerce's conclusion that an iron scrap price would ever be a preferred surrogate price for valuing steel scrap." Id. at 15.

Plaintiffs, by way of support, point to the fact that Commerce itself states in its brief that invoices obtained during the verification process indicated that the input was "steel scrap."[14] See id. at 16; Commerce Br. at 35. Furthermore, Plaintiffs contend that Commerce's statement that cast iron scrap is the predominant scrap used in the production process is "patently false." Pls.' Reply Br. at 16, n.3.

Finally, in Plaintiffs' Reply Brief they contend that in the two subsequent administrative reviews of brake rotors from China (i.e., the final results of the ninth review and the preliminary results of the tenth review), Commerce has valued the steel scrap under subheading 7204.49.00 ("other ferrous scrap") of the HTS, as Plaintiffs argue should have been done in this review.[15] See id.

---

[14] Commerce notes that invoices obtained during its verification process "indicated that the input was 'steel scrap' and did not indicate the exact type of scrap." Commerce Br. at 35.

[15] See Brake Rotors From the People's Republic of China: Final Results of Antidumping Duty Administrative and New Shipper

(continued...)

at 16-17.

In reviewing the record and arguments of both sides, the Court finds that Commerce failed to adequately explain its decision to value the steel scrap at issue here, if it is in fact "steel" scrap, under HTS classification 7204.10.00.  The parties here agree generally on the type of scrap Plaintiffs use in the production process (i.e., some combination of cast iron scrap (from casting strands, handles and rejected rotors) and steel scrap).  It is not clear, however, in what proportion each is used, nor if both should even be considered in this factor of production valuation of what both parties refer to as "steel" scrap.  Commerce does not address Plaintiffs' argument that the scrap composed of scrapped and rejected rotors is not properly accounted for here, nor does it support with evidence its statement that cast iron scrap is the predominant scrap used in the production process.

The Court therefore remands back to Commerce to specifically address and adequately explain (i) whether the rejected rotors, casting strands/handles, etc., reintroduced into the production process should be properly accounted for in this specific factor of

---

[15](...continued)
Reviews and Partial Rescission of the 2005/2006 Administrative Review (the "Ninth Review"), 72 Fed. Reg. 42386 (August 2, 2007); Brake Rotors From the People's Republic of China: Preliminary Results of the 2006/2007 Administrative and New Shipper Reviews and Partial Rescission of the 2006/2007 Administrative Review (the "Tenth Review"), 73 Fed. Reg. 6700 (February 5, 2008).

production analysis; (ii) the composition of the predominant scrap used in the production process; (iii) Plaintiffs' argument that Commerce should be solely focusing on the type of scrap the respondents reported in the factor field "STLSCRAP"; and (iv) whether it has in fact reassessed its position in subsequent reviews as to the proper HTS classification of the scrap at issue here.

### C.   Calculation of Labor Rate

When constructing the "normal value" of products from NMEs under 19 U.S.C. § 1677b(c), Commerce is required to value the "hours of labor required" as a factor of production.  Commerce's regulations provide that when valuing labor rates for NMEs it will

> use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries.  [Commerce] will calculate the wage rate to be applied in nonmarket economy proceedings each year.  The calculation will be based on current data, and will be made available to the public.

19 C.F.R. § 351.408(c)(3).  Consistent with this statute Commerce publishes a single set of labor wage rates that are applicable to all NMEs during the period.  See Commerce Br. at 36.

In order to better understand the issue and arguments involved here an abbreviated timeline of the relevant events is necessary:

• May 23, 2005: Commerce initiated the underlying administrative

review in this case;

• June 30, 2005: Unrelated to the administrative review here, Commerce sought comments on its regression-based methodology for calculating NME wage rates (See Expected Non-Market Economy Wages: Request for Comment on Calculation Methodology, 70 Fed. Reg. 37761);

• May 8, 2006: Commerce published the Preliminary Results, applying to the margin calculation for the mandatory sampled respondents a surrogate PRC wage rate of $0.97 per hour;

• October 19, 2006: Commerce published its antidumping methodologies announcement. See Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, (the "Antidumping Methodologies Announcement and Requests for Comments") 71 Fed. Reg. 61716;

• November 14, 2006: Commerce published the Final Determination continuing to apply a surrogate PRC wage rate of $0.97 per hour; and

• February 2, 2007: finalized rates that took into account the new methodology were released. Commerce Br. at 37, n.6.

Plaintiffs argue that Commerce knowingly used a surrogate hourly rate that did not represent the best available information at the time, adding that when Commerce issued its Final

Determination it "already had settled on significant revisions" to its methodology. Pls.' Br. at 38. Plaintiffs contend that Commerce's Antidumping Methodologies Announcement and Requests for Comments, published approximately one month before the Final Determination in this case, "announced significant, overarching, and final changes in its NME labor rate calculation methodology." Id. at 39.

In support of its determination Commerce argues that in this case it applied the labor wage rate that was published and in effect at the time of the Final Determination and that this rate was therefore the best available information at the time.[16] See Commerce Br. at 36. Specifically, in this review Commerce relied on the 2003 wage rate data because "such rates were the most current data available as of November 2005." Id. at 38. In response to Plaintiffs' arguments, Commerce notes that the new methodology and rates were not final and effective until February 2007 (i.e., after the Final Determination), and thus Commerce reasonably decided to apply the new rate prospectively.[17] See id.

---

[16] Commerce noted that the labor rate here was determined based on a methodology that had been in existence for nearly ten years. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27296, 27367 (May 19, 1997).

[17] Specifically, Commerce noted that the revised methodology was never applied to the 2003 data because the new methodology was finalized in 2007 (i.e., subsequent to its Final Determination) when Commerce revised the calculations utilizing

(continued...)

at 36-37. Additionally, Commerce stresses that the notice and comment period did not end with the Change in Methodology Announcement but that an additional request for comments was published on January 9, 2007. See id. at 37, n.6.

The Court finds that Commerce's decision to use the labor wage rate that was published and in effect at the time of the Final Determination was based on the best available information. As Commerce points out, the new methodology was not finalized at the time of the Final Determination and therefore Commerce's decision to refrain from applying that methodology until it was finalized was reasonable. It is not dispositive here that Commerce's methodology was being revised because of improvements that Commerce was planning to enact in the future. The revision process included a period of requesting comments on the new methodology, and until that comment period was complete, and the resulting comments assessed, the new methodology cannot necessarily be said to constitute the best available information. Therefore, Plaintiffs may not presume that the Antidumping Methodologies Announcement and Requests for Comments necessitated an application of the non-finalized new rate and methodology in this case.

At the time the new methodology is finalized and effective it becomes the best available information, but until that point,

---

[17](...continued)
the 2004 wage rate data. See Commerce Br. at 38.

Commerce must be granted some discretion to assess the advantages and disadvantages of applying a work-in-progress methodology in place of an existing one which is in the process of improvement.

The Court does not address Plaintiffs' argument regarding the Dorbest Limited v. United States, 462 F. Supp. 2d 1262 (Oct. 31, 2006) and Wuhan Bee Healthy Co., Ltd. and Presstek Inc. v. United States, 31 CIT __ (July 20, 2007) decisions, nor the specific facts and arguments involved in those opinions. See Pls.' Reply Br. at 22-23. Under the narrow facts and circumstances in this case, the Court is satisfied that Commerce's determination to apply the labor wage rate that was published and in effect at the time of the Final Determination was based on the best available information.

## II.  Analysis of Sampling Approach Issues

In determining weighted average dumping margins Commerce needs to determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise. See 19 U.S.C. § 1677f-1(c)(1). If it is not practicable to make an individual weighted average dumping margin determination "because of the large number of exporters or producers involved in the investigation or review," Commerce may limit its examination to a reasonable number of exporters or producers by conducting "a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering

authority at the time of selection." 19 U.S.C. § 1677f-1(c)(2).

### A.  Inclusion in the Sample Rate of Respondent Margins based on Adverse Facts Available

In arriving at the sample rate for non-selected respondents Commerce included the adverse facts available rate of 43.32% it assigned to mandatory respondent Hengtai, due to Hengtai's failure to provide Commerce with accurate and complete data.  In assigning this rate to Hengtai, Commerce exercised its authority under section 776(b) of the Tariff Act, which provides that:

> [i]f the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . the administering authority . . . in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

19 U.S.C. § 1677e(b).  In addition, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") states that "[w]here a party has not cooperated, Commerce . . . may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." H.R. REP. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199.

Plaintiffs argue that since Commerce made no finding that

LABEC, Hongda, Luqi, and Gren (i.e., the four Plaintiffs not selected for the sampled group) were uncooperative in this proceeding, the antidumping statute does not permit Commerce to assign these companies a sample rate based in whole or in part on adverse facts available.[18]  See Pls.' Br. at 13-14.

Commerce notes that it calculated the sample rate in this case by "weight-averaging the individual rates of all five of the mandatory respondents, including two de minimis rates, one rate based on 'adverse facts available' and two additional calculated rates." Commerce Br. at 22-23.  Additionally, Commerce stresses that it is not applying adverse facts available to the voluntary respondents, but instead it is "applying a statistically valid sample rate that is representative of producers as a whole."  Id. at 23.  The Court agrees.

Computing a statistically valid sample rate that is representative of the population as a whole may include the margins determined for all selected respondents, even if that sample rate happens to be composed in part on a respondent's rate which is based on adverse facts available.  Accordingly, assigning a sample

---

[18]   The result was a weighted-average sample rate of 8.9%. This sample rate was based in part on the 43.32% adverse fact available rate that Commerce assigned to uncooperative mandatory respondent Hengtai. Commerce, in accordance with § 1677f-1(c)(2)(A), applied this weighted-average rate to all non-selected voluntary respondents. See Commerce Br. at 23; Pls.' Br. at 11; Final Determination.

rate to a group which was calculated including an adverse facts available rate is not an application of adverse facts available as to that group, and is in accordance with Commerce's statutory authority to sample.[19]

It is important to note that Commerce is not cherry picking here, nor is there anything arbitrary about the way it is constructing this sample. As stated above, the overall sample rate was based on a weighted-average which happened to include two de minimis rates along with the rate based on adverse facts available. This Court therefore need not address Plaintiffs' contention that Commerce's approach "punishes fully cooperative parties by assigning them a rate unfairly inflated by the non-cooperation of [another] party," as this is more a moral argument than a legal one. Pls.' Br. at 12-13. A sample rate by its nature cannot meet the precision of an individualized rate as to any given party. Therefore, companies that would otherwise have received an individualized rate lower than the sample rate will in a sense be

---

[19] Commerce notes that 19 U.S.C. § 1677f-1(c)(2) directs it to obtain a "statistically valid" sample while § 1677e(b) authorizes the use of "adverse inferences" where a respondent is non-cooperative. Commerce argues that its determination here "reads these two provisions consistently rather than in conflict, is reasonable, and should be sustained by the Court," and cites to the deference standard under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) and its progeny. Commerce Br. at 25. As the Court agrees with Commerce's alternate argument supra, that this is not a case of applying adverse facts as contemplated under 19 U.S.C. § 1677e(b), this argument need not be addressed.

punished while those that would otherwise have received a higher rate will benefit.[20] This element is an inherent and accepted part of any sample.

Lastly, Plaintiffs state that there is a distinction between determining a statistically valid dumping rate and selecting from a statistically valid pool of respondents. See Pls.' Reply Br. at 5; 19 U.S.C. § 1677f-1(c)(2). Plaintiffs argue that Commerce's statutory obligation is to the latter, and conclude, therefore, that "Commerce's action [including an adverse facts available rate to calculate the sample rate] rests on its false assumption that the law requires a 'statistically valid' dumping rate to result from the 'statistically valid' pool of respondents."[21] Pls.' Reply Br. at 5. While Plaintiffs initial distinction is an accurate statement in and of itself, the conclusion they draw from it is erroneous. Suffice it to say that the point of requiring selection from a statistically valid pool of respondents is to arrive at a statistically valid dumping rate.

---

[20] It is important to note that Plaintiffs' "punishment" argument would apply to any rate factored into the sample rate that would be higher than its own individualized rates.

[21] Plaintiffs contend that "[t]he law does not require that the sample rate be the **most statistically valid rate available**." Pls.' Reply Br. at 5 (emphasis added). The implication appears to be that Commerce may throw out any rates based on adverse facts and still calculate a statistically valid group rate, albeit not the most statistically valid group rate.

## B. Not Allowing for Voluntary Respondents

As stated above, if it is not practicable to make an individual weighted average dumping margin determination, Commerce may limit its review to "a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection." 19 U.S.C. § 1677f-1(c)(2). However, Congress provided that where Commerce limits its examinations to a sample it

> shall establish an . . . individual weighted average dumping margin for any exporter or producer not initially selected for individual examination . . . who submits to the administering authority the information requested from exporters or producers selected for examination, **if - (2) the number of exporters or producers who have submitted such information is not so large** that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.

19 U.S.C. § 1677m(a) (emphasis added); Pls.' Br. at 16.

Plaintiffs argue that "[b]y formally announcing in advance that it would not accept any voluntary respondents," Commerce violated the intent and language of the statute. Pls.' Br. at 17. Plaintiffs stress that Commerce decided not to allow voluntary respondents even before the ultimate number of respondents was known. See id. This decision, Plaintiffs contend, "rendered nugatory the law's Section 782(a) voluntary respondent provision, and illegally truncated a two-step 'sample respondents/consider voluntary respondents' process into a one-step decision." Id.

Plaintiffs point to the fact that Commerce calculated individual company-specific rates for twelve companies in the 2001-2002 review, twelve companies in the 2002-2003 review, and fourteen companies in the 2003-2004 review. See id. at 16. These previous reviews, Plaintiffs contend, demonstrate that "the five respondents individually examined by Commerce in the underlying proceeding were far from 'particularly high,'" and therefore Commerce should have "endeavored to calculate individual rates for as many more companies as possible." Id.

Commerce defends its determination by stressing that "the agency itself is the only entity with the ability to assess its administrative capacity and resources." Commerce Br. at 13. Additionally, Commerce notes that "[t]he fact that in prior reviews of the brake rotors antidumping order, Commerce was able to individually investigate every company that sought a review, including all of the plaintiffs, has no bearing on plaintiffs' present challenge." Id. at 14.

As to Plaintiffs' argument objecting to the advance announcement to not accept any voluntary respondents, Commerce counters by contending that if it "selects the maximum number of companies that it can feasibly review, there is no requirement or reason that [it] should refrain from giving notice of this fact to parties." Id. at 17.

The Court finds that Commerce's determination to limit review

in advance to five of the sixteen companies was in this case within the bounds of its statutory authority.

Since it is not disputed that Commerce has the statutory authority to sample, the two questions in need of answering are (i) whether Commerce is authorized to make an advanced assessment of the anticipated resources that it can devote to a given review and announce any constraints accordingly (here, limiting individual reviews to the five mandatory sampled respondents); and (ii) whether in this case Commerce reasonably selected the maximum number of companies that it can feasibly review.

The Court agrees with Commerce that it is within its authority to make an advanced assessment of the anticipated resources that it can devote to a given administrative review and, having made such an assessment, may announce any administrative limitations.  The United States Court of Appeals for the Federal Circuit has recognized that "agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative enforcement resources." Torrington v. United States, 68 F.3d 1347, 1351 (citing Heckler v. Chaney, 470 U.S. 821, 831 (1985)). Commerce, like any organization seeking efficient operations, plans for the proper management of its time and resources.  There is no statutory requirement for Commerce to apply a pro forma bifurcated approach as Plaintiffs contend.

As to the second question, the Court finds that Commerce's

determination to limit review in this case to five companies is reasonable.  The record does not show, and Plaintiffs did not demonstrate, that Commerce could have conducted more individual examinations without undue burden and without inhibiting the timely completion of the investigation.  It is not enough to merely point to past reviews which included more companies, as administrative capacity and resources may change from year to year.

### C. Sample Rate as Applied to Plaintiffs Not Supported or Representative

Commerce calculated the sample rate in this review by "weight-averaging the individual rates of all the selected respondents, chosen through a statistically valid, random sampling exercise, and applied that weighted-average rate to the non-selected voluntary respondents," including Plaintiffs. Commerce Br. at 19.

Plaintiffs argue that the Final Determination rate assigned to LABEC, Hongda, Luqi and Gren was contrary to law because the record evidence demonstrates that the rate assigned through the sample is not representative of the companies' actual level of dumping. See Pls.' Br. at 20.  Plaintiffs contend that Commerce "should have used the U.S. sales and [factors of production] data and/or the quantity and value data submitted by each of the companies as the best available information to calculate company-specific margins." Id. at 19.  Plaintiffs add that Commerce "ignored this information, and examined the sales and [factors of production] data only of

those companies selected through Commerce's sampling exercise." Id. at 20.

Plaintiffs also point to § 1677m(e) of the statute which states that Commerce "shall not decline to consider information that is submitted by an interested party . . . but does not meet all the applicable requirements established by the administering authority" if certain criteria is met. Id. at 19-20.

Plaintiffs' argument, accurately restated by Commerce, is that "although [Plaintiffs] were not selected for the review, Commerce should have nevertheless relied upon [Plaintiffs' respective] company-specific submissions for purposes of calculating their antidumping margins." Commerce Br. at 19. Commerce correctly points out that Plaintiffs argument is contrary to § 1677m of the statute which, as discussed supra, allows Commerce the authority to decline individual reviews when conducting such reviews would be unduly burdensome and inhibit the timely completion of the investigation. See § 1677m(a)(2).

In response to Plaintiffs' § 1677m(e) argument, Commerce correctly counters that this provision of the statute does not apply, as "Commerce did not reject plaintiffs' submission for failure to meet applicable requirements; rather, it determined not to conduct individual reviews (including calculation of an individual antidumping rate) as a result of lack of administrative resources." Commerce Br. at 20. Additionally, Commerce stresses

that "[t]he mere submission of an initial questionnaire response normally will not provide a basis for determining an antidumping rate" and that "[i]n many cases, there are multiple additional submissions and verification of data." Commerce Br. at 21-22.

The Court finds that Commerce's determination to apply the weighted-average sample rate to the non-selected voluntary respondents, including Plaintiffs, was reasonable and in accordance with Commerce's statutory authority. Since it is reasonable for Commerce to select the maximum number of companies that it can feasibly review based on administrative resources available (which can be a number less than the total number of companies seeking review), then it must be understood that companies not selected for review will not have individual rates applied.

Conducting an administrative review, as Commerce points out, is not as simple as Plaintiffs would suggest and additional submissions and/or verification can be required. See Commerce Br. at 21-22. The Court agrees with Commerce's assessment that "Plaintiffs' approach would create an untenable result that negates Commerce's authority and ability to internally manage its administrative resources." Id. at 22. As Commerce correctly states it, Plaintiffs would have this Court impose a standard under which Commerce would be required to either: (i) conduct a review for every respondent that claims to have submitted complete sales and production data, regardless of the agency's decision to limit

the number of producers examined; or (ii) rely upon potentially incomplete and unverified questionnaire responses for determining all voluntary respondent rates. See id. This standard is contrary to the statute.

**CONCLUSION**

In accordance with the foregoing, the Court affirms Commerce's determination in part and remands in part.

/s/ Nicholas Tsoucalas
**NICHOLAS TSOUCALAS**
**SENIOR JUDGE**

Dated:     June 26, 2008
           New York, New York